owner of, or has not the title to, the claim or debt sued on. When the answer demurred to contains no denial of the allegations of the complaint, but sets up new matter, the court, in considering the demurrer, will treat the allegations in each pleading as true. Long v. Mayor, etc., 81 N. Y. 427; Wiley v. Village of Rouses Point, 86 Hun, 495, 33 N. Y. Supp. 773. We therefore must assume that, at some date before the commencement of the action, Shank, being the owner of a debt against defendant for $550, assigned it to F. H. Janes, in payment of a debt he owed to Janes for work, labor, and services and materials furnished. The defense demurred to relates to an instrument dated May 17, 1893, between Shank and F. H. Janes, of an executory character; and we may assume that it is in effect alleged that that instrument was subsequently canceled as between Shank and F. H. Janes. There is, however, no allegation that the instrument of May 17, 1893, is a part of plaintiff's title, or has anything to do with the claim she sues on. It is entirely different in its character from the assignment which she alleges from Shank to F. H. Janes, and we have, I think, no right to assume that they refer to the same transaction, in the absence of appropriate allegation to that effect. Dechert v. Light Co., 84 Hun, 575, 32 N. Y. Supp. 727. It may be that if the assignment from Shank to F. H. Janes, through which the plaintiff claims title, was, before the assignment to plaintiff, in effect abrogated or nullified, so that no title passed to plaintiff, the defendant could defend on that line. That question, however, is not here. All of the allegations of fact in the answer may be true, and still the absolute transfer made by Shank to F. H. Janes, in payment of a debt then existing from Shank to Janes, as alleged in the complaint, may be still in full force and effect. It follows that the demurrer was properly sustained.

Interlocutory judgment affirmed, with costs, with leave to amend on payment of costs of demurrer and of appeal. All concur.

---

(19 App. Div. 509.)

### LIBERTY INS. CO. v. CENTRAL VERMONT R. CO. et al.

(Supreme Court, Appellate Division, Third Department. July 6, 1897.)

1. REVIEW ON APPEAL—CONFLICTING DECISIONS.

   Though different minds, equally intelligent and upright, may come to different conclusions on the same evidence, yet conflicting decisions thereon are to be avoided, if possible; and when a case is presented in which, upon conflicting evidence relating to the same occurrence, trial courts have come to directly opposite conclusions, one of which has been sustained on appeal, it becomes the duty of the appellate court, in re-examining the second decision, though not bound by such former decision, to ascertain, if possible, the causes for the difference, and whether any improper elements have been allowed to enter, or the evidence has been weighed on erroneous principles.

2. WAREHOUSEMAN—EVIDENCE OF NEGLIGENCE.

   In an action against a warehouseman to recover for goods lost or destroyed while in his custody, the burden of proving negligence rests upon the plaintiff, and does not shift, though the weight of evidence may have a controlling effect, unless met by proof from the other party.

**3. SAME—BURDEN OF PROOF.**

Proof that goods in the custody of a warehouseman were destroyed by fire does not invoke the doctrine of res ipsa loquitur, so as to relieve the plaintiff from the necessity of showing affirmatively that the fire was caused by negligence.

Merwin, J., dissenting.

Appeal from judgment on report of referee.

Action by the Liberty Insurance Company of the city of New York against the Central Vermont Railroad Company and others. Judgment for plaintiff. Defendants appeal. Reversed.

The defendants, with the exception of Ladd & Smallman, are corporations, and at the time of the fire hereinafter mentioned operated together an elevator situated at Ogdensburgh, receiving, transporting, storing, and delivering grain from vessels arriving at Ogdensburgh. Some time in August, 1890, Ladd & Smallman shipped to themselves at Ogdensburgh about 10,000 bushels of grain. Upon its arrival it was transferred from the vessels to such elevator, and was there stored and kept pursuant to a general agreement by Ladd & Smallman with the superintendent of said elevator that it was so to be kept and forwarded to them from time to time as requested. On or about the 9th day of September, 1890, the elevator was destroyed by fire, and the grain therein burned or damaged. The plaintiff is an insurance corporation with which the firm of Ladd & Smallman had insured the grain in said elevator. The plaintiff paid the loss thereon, and has become subrogated to the rights of Ladd & Smallman. The elevator was situated on the bank of the St. Lawrence river. It was 180 feet in length by 80 feet in width, and its height from the dock was 117 feet. There were docks on three sides of it, and the vessels were unloaded into the elevator on the east and west sides. The outer walls of the building, up to the bottom of the bins hereinafter referred to, were of brick, and about 12 inches thick. Above that the walls were of wood, veneered with brick, about the thickness of a single brick. Upon the first floor there were several doors of iron. The upper part of the building consisted of bins for the holding and storage of grain. The height of these bins was about 50 or 60 feet, and for that distance there were no windows or other openings in the building. The bottom of the bins formed the ceiling of the first story. On the east and west sides of the building were projections, built of wood, coming down to within about twelve feet of the dock, and in the upper part of each projection was an iron door, which led into the main building some 70 feet above the dock. There was an opening from each of these projections into the building about 35 feet above the dock. through which a wooden spout was constructed to receive the grain coming from the "marine leg," and conveying it to the receiving bin, immediately on the inside of the elevator wall. The "marine leg," so called, was substantially an iron box about 56 feet long, inside the wooden projection. At each end was a pulley around which passed a belt carrying buckets for scooping up the grain. The lower part of the marine leg was free, and when a boat was to be unloaded it was lifted from the dock, lowered into the hold of the vessel, and by means of machinery the buckets were kept revolving and scooping up the grain from the hold of the vessel and carrying it up to the spout, from whence it passed through the wall of the elevator into the receiving bin above mentioned. From the receiving bin the grain passed into what was called a "hopper bin," in or at the bottom of which were located scales for the purpose of weighing grain. This hopper or weighing bin rested upon the first floor of the elevator building. At one side of this weighing bin was a lofting leg, which was constructed upon the same general principle as the marine leg situated outside of the building. It was constructed of iron, and was about 65 feet in height. Inside of it ran a belt, upon which were fastened buckets that carried the grain from the weighing bin to the top of the building. From thence it was distributed into the various bins for storage. The bottom of the lofting leg containing the lower pulley around which passed the belt to which the buckets were attached extended about four feet below the floor. The bottom of the lofting leg went into what is called a "boot," composed of iron, and that rested on a timber upon the ground under the floor. The first story

of the elevator was about 14 feet high. Around the bottom of the lofting leg, and below the floor, was a wooden bin, three or four feet deep, used to receive the grain from the lofting leg in case it became choked. The "arbor," so called, upon which the iron pulley at the bottom of the lofting leg was fastened, revolved in a box of iron packed with Babbitt metal. The arbor required frequent oiling, to prevent friction. The operation of the lofting leg and the hoisting of the grain caused a considerable amount of dust to accumulate around the bottom of the leg inclosed in the small box of iron above described. There is evidence to show, although it is controverted, that the dust accumulated during the day from the operation of the elevator had not been swept or cleaned out the evening before the fire at the close of the day's business,—something that the rules of the company required its employés to do. The fire, when first discovered, was in the wooden projection on the west side of the building, about 35 feet above the dock, being seen through the second window in such projection. The theory of the plaintiff is that the arbor at the foot of the lofting log became overheated, and set fire to the accumulations of dust there, and the fire was then transmitted through the weighing bin into the receiving bin, and thence through the wooden spout into the projection, there being communication through these different places. The referee found that there was negligence upon the part of the defendants, which caused the fire in question, and rendered judgment in favor of the plaintiff, from which judgment the defendants appeal to this court.

Argued before PARKER, P. J., and LANDON, HERRICK, MERWIN, and PUTNAM, JJ.

Louis Hasbrouck, for appellant Central Vermont R. Co.

A. H. Herriman, for appellant Ogdensburg & L. C. R. Co.

Charles G. Idler, for appellant Ogdensburg Terminal Co.

Davies, Short & Townsend (John P. Kellas, of counsel), for respondent.

HERRICK, J. An action arising out of the same fire which gives rise to the appeal now here has heretofore been before us (North British & M. Ins. Co. v. Central Vermont R. Co., 9 App. Div. 4, 40 N. Y. Supp. 1113), and in that case the referee found that the fire was not caused by the negligence of the defendants, and this court, after a consideration of the evidence, came to the conclusion that the decision of the referee in that respect was correct. I have not been able to find, nor have counsel pointed out, any substantial difference between the evidence in that case and the one now before us. While the fact that this court in a former case affirmed a judgment where the finding as to negligence was directly the contrary to the finding in this case is not conclusive (Underwood v. Cook, 3 N. Y. St. Rep. 467), and while it may well happen that in a case that is somewhat close upon the facts the court upon appeal will not disturb a finding made either way, and as different minds equally intelligent and upright may take different views of the evidence, and come to diverse conclusions, and, there being evidence to sustain either conclusion, the appellate court under well-settled rules would not feel at liberty to reverse either as against the weight of evidence, yet conflicting decisions upon the same evidence are to be avoided, if possible, being calculated, in the nonprofessional mind at least, to lessen confidence in the administration of justice. When, therefore, a case is presented where, upon conflicting evidence, or evidence from which different inferences may be drawn, the trial courts have come to directly oppo-

site conclusions, one of which we have already sustained, it becomes our duty to ascertain, if possible, the causes for such differences, whether improper elements have been allowed to enter in, or the evidence weighed and the facts considered upon erroneous principles.

In all contests over questions of fact upon conflicting evidence, or evidence susceptible of different inferences, the question as to who has the burden of proof resting upon him is a very important one, and the decision of that question may, and frequently does, practically determine the finding as to the facts. Hence the holding of the trial court in that respect becomes a matter of importance. Formerly, in a properly tried case, this could be ascertained by an inspection of the rulings upon requests to find, but under the present practice that resource, as a general rule, is not open to us. It seems to me, therefore, that when there is an opinion we may properly look into that to ascertain the standpoint from which the trial court viewed the evidence, and see whether he came to its consideration with any erroneous views as to the rules which should govern him in its consideration. Kenyon v. Kenyon, 88 Hun, 211, 34 N. Y. Supp. 720, and cases cited. It is somewhat difficult in this case to determine precisely just what views the referee had as to the burden of proof. In the course of his opinion he says:

"The demand by the bailor of his property in the possession of a bailee, and the simple refusal to deliver without explanation, is sufficient evidence of conversion,—a loss or destruction of it,—and would be deemed sufficient proof to maintain an action and recovery of damages." "Again, if the bailee alleges and proves that it has been destroyed by fire, or has been stolen, he must show that the fire or the theft occurred without his fault." "Hence it may well occur that the bailor, instead of proving a demand and a refusal, proves the destruction of the property by fire. The party [plaintiff] has proved one fact, viz. that the fire destroyed the property, but he has not proved the other fact, viz. that the fire occurred and destroyed the property without the fault of the bailee." "Now, I think it well established by the cases that the nature of an accident may itself afford prima facie proof of negligence. Curtis v. Railroad Co., 18 N. Y. 534, 544; Story, Bailm. 338; and other cases cited in Russell Manuf'g Co. v. New Haven Steamboat Co., 50 N. Y. 121, 127." "Negligence may be inferred from the circumstances of the case. Where the accident is one which, in the ordinary course of events, would not have happened but for want of proper care on the part of the defendant, it is incumbent upon him to show that he had taken such precaution as prudence would require; and the failure to furnish the proof, if it existed, it would be in his power to make, may subject him to the inference that such precautions were omitted. Scott v. Docks Co., 3 Hurl. & C. 596."

Taking these passages in connection with the rest of his opinion, it seems to me that he approached the consideration of the evidence and made his findings of fact upon the assumption that when the fire was proved then the burden of proof rested upon the defendants to affirmatively prove that it occurred without negligence upon their part. This, I think, was error. The referee has held that the defendants were acting as warehousemen in keeping the grain in the elevator, and that such grain was retained in the elevator for the mutual benefit and advantage of the defendant corporations and of Ladd & Smallman; and in so holding I think he was correct. The complaint alleges the destruction of the grain by fire, and also alleges that such fire occurred by reason of the defendants' negligence. The answer

denies any negligence upon the part of the defendants, and the question of negligence was practically the only question litigated.   As a rule, the burden of proof remains where the issue made by the pleadings places it, although the weight of evidence on one side may have a controlling effect, unless met by proof of the other party.   Blunt v. Barrett, 124 N. Y. 117, 26 N. E. 318.   This rule has not been changed, nor the case of an action against a bailee for loss of merchandise made an exception to that rule, by the case of Wintringham v. Hayes, 144 N. Y. 1, 38 N. E. 999, wherein it is said that:

"While it is true, as a general proposition, that a bailor charging negligence on the part of a bailee rests under the burden of proof, yet oftentimes slight evidence will shift the burden to the bailee.   In an action against a bailee for loss or damage to goods by accident,· proof of nature of the accident may afford prima facie proof of negligence."

The expression used in that and some other opinions as to the "shifting" of the burden of proof has led to some confusion and misapprehension as to the rule.   The true rule, I think, is, as I have above stated, where the issue made by the pleadings placed it, and it never changes.   "During the progress of a trial it often happens that a party gives evidence tending to establish his allegation, sufficient, it may be, to establish it prima facie; and it is sometimes said that the burden of proof is then shifted.   All that is meant by this is that there is a necessity of evidence to answer the prima facie case, or it will prevail; but the burden of maintaining the affirmative of the issue involved in the action is upon the party alleging the facts which constitute the issue, and this burden remains during the trial."   Heinemann v. Heard, 62 N. Y. 448; Heilman v. Lazarus, 90 N. Y. 672; Spencer v. Insurance Ass'n, 142 N. Y. 505, 37 N. E. 617.   "As a general rule, where a bailee fails on demand to deliver to the bailor property to which the latter is entitled, the presumption of liability arises, and, if the goods cannot be found, it furnishes the imputation of negligence as the cause.   But such prima facie case may be overcome when it is made to appear that the loss was occasioned by some misfortune or accident not within the control of the bailee.   Then the onus continues upon the bailor to prove that it was chargeable to the want of care of the bailee.   And although it may be that the proof given by him explanatory of the reason for nondelivery may disclose circumstances which, in their nature, permit or require the inference of negligence on his part, the affirmative of the issue is not shifted to the defendant, but remains with the plaintiff.   In the present case the plaintiff alleged in his complaint, and it appeared, that the loss resulted from the destruction of the factory by fire.   From that fact alone no presumption arose to furnish a prima facie case against the defendant.   But upon the main issue—whether it was attributable to the negligence of the defendant—the burden was with the plaintiff."   Stewart v. Stone, 127 N. Y. 500, 28 N. E. 595.

The burden of proof is upon the plaintiff who alleges negligence against a warehouseman who accounts for his failure to deliver goods by showing their destruction by fire.   The plaintiff must in all cases suing him for the loss of goods allege and prove negligence.   This burden is never shifted from him.   A demand and a refusal to deliver,

unexplained, are sufficient, prima facie, to show negligence; but if it appears, either in the plaintiff's or defendant's proof, that the goods were lost by fire, the evidence must show that the fire arose from the negligence of the warehouseman.   Claflin v. Meyer, 75 N. Y. 260; Lamb v. Railroad Co., 46 N. Y. 271.   I think, therefore, that the burden of proof of negligence of the defendants rested upon the plaintiff all through the case.

Neither do I think that the doctrine of res ipsa loquitur applies to this case.   The occurrence of fires without negligence is frequent, and the mere fact of a fire does not justify the inference or constitute a prima facie case of negligence.   Whitworth v. Railroad Co., 87 N. Y. 413;  Stewart v. Stone, 127 N. Y. 500, 28 N. E. 595.   The attendant or surrounding circumstances may characterize the fire as one caused by negligence, but the fire alone does not speak for itself, and proof of the circumstances showing the fire to have occurred through the negligence of the defendants must be given by the plaintiff.   He cannot rest by merely proving the fire, and then call upon the defendants to show that it did not occur through their negligence.   In this case it does not seem to me that the evidence, in addition to the mere proof of the fire itself, establishes affirmatively the fact that it occurred by reason of the defendants' negligence.   As first above stated, the plaintiff's theory, which was apparently adopted by the referee, is that the arbor at the foot of the lofting leg became overheated, and set fire to the accumulation of dust there, and the fire was then transmitted through the weighing bin into the receiving bin, and thence through the wooden spout into the projection.   There is evidence that the dust at the foot of the lofting leg had not been brushed away at the close of the day's work, as the rules adopted for the working of the elevator required, although that is disputed by the foreman of the elevator; and there is also evidence that the arbor was liable to become overheated by friction, and that it required constant oiling, and that the tubes through which the arbor was oiled had been removed; and also evidence that the dust from the grain was inflammable in character; and there is also evidence that at the close of the day's work, and before 9 o'clock in the evening, the arbor was somewhat heated, and that there was a smell as though of something heated or burning, although there was no evidence of any fire at that time.   The witness testifying to the heat of the arbor testified that it did not burn his hand in placing it upon it.   There was evidence also that the watchman employed was inefficient.   Notwithstanding this evidence, I do not think that the facts in the case justify a finding that the fire was caused in the manner, or originated at the place, claimed by the plaintiff.   The defendants controverted all the evidence as to the matters just stated, but, assuming the plaintiff's testimony to have substantiated them all, yet, unless those acts of negligence or omission caused the fire, it cannot be said that it occurred by reason of the defendants' negligence. The finding that the fire occurred through the defendants' negligence is predicated upon the assumption that its origin was at the foot of the lofting leg, and that the defendants' neglect in caring for the machinery at that point produced the fire, and that, if the watchman had been efficient and alert, he would have discovered it in its incipiency,

and extinguished it.    Unless, then, it appears that it did so originate
at the foot of the lofting leg, the whole foundation for the finding
that the fire occurred by reason of the defendants' negligence is swept
away.    The first seen of the fire was between 4 and 5 o'clock in the
morning, in the west projection, about 35 feet from the ground.    One
witness testified that he was in the building at the first outbreak of
the fire, and before any alarm was sounded, and that he saw fire in two
places upon the first floor.    According to his testimony they were ap-
parently small fires, and neither one of them was near the foot of the
lofting leg or arbor.    Five other witnesses—four of them members of
the fire department—came in there very shortly afterwards, looking
for the fire, and all of them testify that there was no fire in or upon
the first floor of the building.    The lofting leg itself was composed
of iron; there was no inflammable material inside of it; the pulleys
around which the belt passed were of iron; its lower end rested
in an iron boot,—so that there seemed to be nothing that could
furnish a blaze that could be carried up through the interior of the
pipe.    The only inflammable material at or near the foot of the loft-
ing leg was the dust, if any, the wooden box, and the wooden floor.
If the fire originated there, it must have been the box and floor that
furnished the burning material from which the fire would be communi-
cated up through the receiving bin, and thence through the spout
into the west projection.    It could not go up through the lofting leg,
and must, consequently, have gone up directly from the floor.    Not
only these facts, but the testimony of the witnesses I have referred to,
dispute the fact that the fire originated either at the foot of the lofting
leg or upon the first floor; so that neither the alleged negligent care
of the machinery of the lofting leg caused the fire, nor did the alleged
inefficiency of the watchman prevent its early discovery, because, how-
ever vigilant he may have been, he could not discover what did not
there exist.

For these reasons, the judgment should be reversed, the referee dis-
charged, and a new trial granted; costs to abide the event.    All con-
cur, except MERWIN, J., dissenting.